UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRIAN S. CHARBONNEAU,

                                      CASE NO. 2:18-cv-10112

         *Plaintiff*,              DISTRICT JUDGE SEAN F. COX

*v.*                          MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

         *Defendant*.

_____/

**CORRECTED[1] MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 12, 14)**

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports Defendant Commissioner of Social Security's determination that Plaintiff Brian S. Charbonneau is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment, (Doc. 12), be **DENIED**, the Commissioner's Motion, (Doc. 14), be **GRANTED**, the Commissioner's final decision denying benefits be **AFFIRMED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned Magistrate Judge to review the final

---

[1] The first Report and Recommendation (R. 17) inadvertently stated that substantial evidence does *not* support the Commissioner's decision. No other changes have been made.

decision of the Commissioner denying Plaintiff's claim for Title II Disability Insurance Benefits (DIB). (Doc. 4.) The case is presently before the Court upon the parties' cross-motions for summary judgment. (Doc. 12, 14.)

Plaintiff applied for DIB benefits on November 26, 2014,[2] alleging that his disability had begun roughly three years before. (R. 8, at PageID.163.) The Commissioner denied the claim. (R. 8, at PageID.97.) Plaintiff then requested a hearing before an ALJ, which occurred on February 9, 2017. (R. 8, at PageID.55-82.)  The ALJ issued a decision on March 1, 2017, finding Plaintiff not disabled during the relevant period. (R. 8, at PageID.39-50.) On December 1, 2017, the Appeals Council denied review, (R. 8, at PageID.25-27), and Plaintiff filed for judicial review of the final decision on May 3, 2018. (R. 1). He then filed the instant Motion for Summary Judgment on March 16, 2018, (R. 12), and the Commissioner countered with its own Motion the following month, (R. 14).

### B.    Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a

---

[2] The actual application states that Plaintiff filed on November 26, (R. 8, at PageID.163), and Plaintiff uses the same date, (R. 12, at PageID.584.) However, the initial denial letter, the ALJ, and Defendant all date the filing a day earlier, on November 25. (R. 8, at PageID.39, 97); (R. 14, at PageID.612.) This conflict has no effect on the case's outcome and I will use the application's date.

preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C.    Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your

3

impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or] her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d

640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other

jobs in significant numbers exist in the national economy that [the claimant] could perform

given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at

241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was

not disabled. (R. 8, at PageID.39-50.) At step one, the ALJ found that Plaintiff's last date

of insured status was June 30, 2019, and that he had not engaged in substantial gainful

activity since his alleged onset date of May 1, 2012. (R. 8, at PageID.41.) At step two, the

ALJ concluded that Plaintiff had the following severe impairments: asthma, sleep apnea,

and lumbar degenerative disc disease. (*Id.*) The ALJ also decided, however, that these

impairments did not meet or medically equal a listed impairment at step three. (R. 8, at

PageID.42-43.) Next, the ALJ found that Plaintiff had the residual functional capacity

(RFC) to perform

> light work as defined in 20 C.F.R. 404.1567(b) except that the claimant can
> frequently balance; occasionally climb stairs and ramps, stoop, kneel, crouch,
> and crawl; and never climb ladders, ropes and scaffolds. He can never be
> exposed to vibrations, unprotected heights, and moving machinery parts. The
> claimant can have occasional exposure to dust, odors, fumes, pulmonary
> irritants, extreme cold, extreme heat, humidity, and wetness.

(R. 8, at PageID.43.) At step four, the ALJ found that Plaintiff could perform his past

relevant work as a transport officer. (R. 8, at PageID.49-50.) This finding relied on the

VE's testimony about the transport officer position, DOT code number 372.677-010, which

the VE characterized as light exertional work as generally performed. (R. 8, at PageID.43.)

Because this finding resolved the case, the ALJ did not proceed to step five.

### E.    Administrative Record

#### 1.    Medical Evidence

On January 4, 2012, Plaintiff had an imaging study done of his hips, revealing a small calcification but otherwise finding "normal-appearing hips." (R. 8, at PageID.277.) Around this time, he had been experiencing severe pain for a few weeks, sometimes up to 8 or 9 out of 10 on a visual analog scale. (R. 8, at PageID.451.) Prolonged standing increased the pain, as did carrying a firearm, which he did for his job as a prison guard. (*Id.*) Imaging of his lumbar spine on the same day showed severe degenerative disc disease at L4-L5 and bilateral facet arthropathy in the same location. (R. 8, at PageID.278.) About two months later, more imaging showed a degenerative disc bulge at the L4-L5 level, a moderate disc herniation at the L2-L3 level, and degenerative changes at L4-L5 and to a "lesser extent" L5-S1 and L2-L3. (R. 8, at PageID.275-276, 467-468.) Dr. Sheryl Hasegawa believed that Plaintiff needed to remain off work until February 6, 2012. (R. 8, at PageID.452.)

He continued experiencing pain in March. (R. 8, at PageID.449). When it radiated into his right leg, the pain reached 7 or 8 out of 10; otherwise, it was only at 1 or 2 out of 10. (*Id.*) On March 5, 2012, Dr. Hasegawa concluded that Plaintiff should not return to work until April 2, 2012. (R. 8, at PageID.450.) Later in the month, she extended the estimate until May 7, 2012, when Plaintiff would have completed physical therapy.

At an examination by Dr. Sohail Jilani on March 21, 2012, Plaintiff stated that his back pain had begun seven years prior. (R. 8, at PageID.269.)[3] He had tried physical therapy in the past, which had helped. (*Id.*) His pain could reach 8 on a scale of 0 to 10, but presently the pain was "getting better" and was "tolerable." (*Id.*) He could sit and drive for an hour, "standing and laying down is not a problem, walking is not a problem, and he is lifting up to 40 pounds." (*Id.*) On examination, his lumbar spine was not tender, although his range of motion was limited by pain and stiffness. (*Id.*) Straight leg raise tests were negative. (*Id.*) His arms and legs were normal, displaying functional range of motion without pain. (R. 8, at PageID.270.) His strength, sensation, reflexes, and gait were also normal. (*Id.*) And he was alert and properly oriented. (*Id.*) Going forward, Plaintiff wanted to try physical therapy and use Advil—he did not need pain medication. (*Id.*) Dr. Jilani did not believe the situation was an "emergency," and thought surgery should be considered only if the symptoms returned. (R. 8, at PageID.447.)[4]

Plaintiff completed physical therapy at various times in 2012. At the first session, in January, his hip pain and back pain were evaluated at HealthTrak Rehabilitation Services. (R. 8, at PageID.459-464.) He rated his "soreness" as 2 or 3 out of 10 on a visual analog scale. (R. 8, at PageID.459.) He had "no c/o [i.e., complaints] of back pain on this date." (*Id.*)[5] He did complain, however, of "barriers" to standing, walking, and carrying,

---

[3] On an intake form, Plaintiff also mentioned having shortness of breath, cough, and asthma, but these were not discussed in the treatment notes. (R. 8, at PageID.274.)

[4] This statement came from Dr. Hasegawa's notes.

[5] The notes simply state "c/o," which appears to be a medical abbreviation for "complains of." Amer. Speech Language Hearing Assoc., *Common Medical Abbreviations*, at p. *1, *available at* http://www.asha.org/uploadedfiles/slp/healthcare/medicalabbreviations.pdf (last visited Dec. 18, 2018).

but not sitting, gripping, pushing, pulling, climbing stairs, lifting, or driving. (R. 8, at PageID.460.) The therapist believed Plaintiff would respond well to "conservative" physical therapy and stretching. (*Id.*)

A detailed assessment of Plaintiff's capabilities followed. (R. 8, at PageID.460-464.) The range of motion of Plaintiff's lumbar spine was normal, although he had pain upon touch on his right greater trochanter, part of the upper thigh bone. (R. 8, at PageID.460.) The FABER test, measuring hip, lumbar spine, and sacroiliac joint pathology, Jennifer Bagwell, et al., *The Reliability of FABER Test Hip Range of Motion Measurements*, 11 Int'l J. of Sports Physical Therapy 1101, 1102 (Dec. 2016), was negative. (R. 8, at PageID.460.) His leg strength was normal, as was his gait. (*Id.*) At the end of his therapy, Plaintiff rated his confidence to perform various activities: he was fully confident that he could lay flat and walk- a short distance; he was confident that he could move from lying to sitting, bend and stoop, balance, kneel, walk long distances, climb stairs; he was confident to moderately confident in his ability to stand, lift from the waist, and drive; and he had moderate confidence in sitting, walking on uneven ground, rising from a chair to stand, lifting from the floor, and carrying. (R. 8, at PageID.463.) Overall, he had 75 percent confidence in his capacity for completing daily activities and work. (*Id.*)[6] Upon discharge, he rated his pain at 2 out of 10, with some continuing discomfort when he carried his firearm on his right hip. (R. 8, at PageID.465.) The discharge notes state he had normal strength and range of motion. (*Id.*)

---

[6] Two forms provide these confidence measurements, each dated January 11, 2012. (R. 8, at PageID.463-464.) A few minor differences appear between the forms, but none that are significant.

He also attended physical therapy in April 2012. (R. 8, at PageID.279.) The notes indicate Plaintiff had some pain and difficulty with sitting and driving, which did not improve with treatment. (*Id.*) During an examination by the therapist on April 5, Plaintiff did not have pain in his lumbar spine transverse process,[7] and only had one "mild twinge at L4 spinous process" with palpation. (R. 8, at PageID.283.)

At an undated examination—the notes from which were packaged with records from the spring of 2012—Plaintiff's spine had good mobility but was tender at the L-5 vertebra; no abnormalities were noted regarding his arms and legs. (R. 8, at PageID.446.) A note from April 12, 2012, indicates that his low back pain was "very manageable" and had stopped shooting down his right leg. (R. 8, at PageID.443.) He had a cough, but denied cardiovascular and respiratory issues, including asthma. (R. 8, at PageID.444.)

In November 2012, Plaintiff went to the emergency room due to abdominal pain. (R. 8, at PageID.337.) A CT scan of the abdomen and pelvis was unremarkable except for mild pancreatitis, fatty infiltration of the liver, mild bile ductal dilation, and "nonobstructive inguinal hernia." (R. 8, at PageID.345.) During an examination a little later, no abnormalities were found except slight firmness and tenderness in his abdomen. (R. 8, at PageID.322.) He was diagnosed with pancreatitis. (R. 8, at PageID.322.) A diagnosis of asthma was also noted, but it was "stable," he denied any associated problems, and no relevant abnormalities related to asthma were uncovered during the examination. (R. 8, at PageID.317, 320); *see also* (R. 8, at PageID.322 (noting clear lung sounds).)

---

[7] The transverse process is "[a] bony extension projecting outward from the side of a vertebra. There is one on each side." 6 J.E. Schmidt, *Attorney's Dictionary of Medicine & Word Finder* (2013).

The following day he was examined by Dr. Abul Islam. (R. 8, at PageID.337.) By that time, his pain had diminished. (*Id.*) His examination was again unremarkable. (R. 8, at PageID.337-338.) Dr. Hasegawa also treated Plaintiff at the hospital. (R. 8, at PageID.319.) Plaintiff noted his chronic low back pain, but said it was "currently asymptomatic and he has not had any pain with neck, knee, or shoulders." (R. 8, at PageID.320.) The physical examination found that his abdomen protruded slightly and was tender; otherwise, the results were unremarkable. (*Id.*)

He was discharged on November 3, and CT scans later in the month confirmed that his pancreas had returned to normal. (R. 8, at PageID.310, 317, 374.) A year later he had a follow up examination with Dr. Islam. (R. 8, at PageID.354.) Plaintiff said he was "doing well" and had "no complaints at this time." (*Id.*) The session notes describe that Plaintiff walked without assistance, sat "comfortably on the examination table without difficulty or evidence of pain," had clear lungs, and was alert and oriented to time, place, and person. (R. 8, at PageID.355.) No other abnormalities were observed. (*Id.*)

Later in November, a physical examination by Dr. Hasegawa did not reveal any abnormalities: his gait was not unsteady, he had normal motor bulk and tone, and he was properly oriented. (R. 8, at PageID.439-440.) He denied chest pain and pressure and muscle weakness. (R. 8, at PageID.439.) The next record from Dr. Hasegawa was from July 2013 for a general health maintenance examination. (R. 8, at PageID.413.) Plaintiff reported that his general health had been good over the past year. (*Id.*) He exercised regularly by walking. (*Id.*) What is more, he denied neck and back pain, weakness, fatigue, wheezing, chest pain and pressure, or related maladies. (R. 8, at PageID.414.) His arms and legs had

10

normal bulk and tone, his gait was normal, his posture was good, his hips and spine were benign, his respiratory and cardiovascular systems were normal, and he had normal reflexes, normal motor bulk and tone, proper orientation. (R. 8, at PageID.415-417.) The neurological portion of the examination uncovered no abnormalities. (R. 8, at PageID.417.)

In September 2013, he saw Dr. Hasegawa for jaw pain. (R. 8, at PageID.406.) He denied fatigue. (R. 8, at PageID.407.) His examination results were normal except for a cavity, which led to a diagnosis of "tooth decay." (R. 8, at PageID.408.) At an appointment with Dr. Scott Baker for allergies in March 2014, the relevant physical examination results were normal; specifically, his respiratory results were normal and his orientation was proper. (R. 8, at PageID.403-405.)

The next report from Dr. Hasegawa was from nearly a year later, in August 2014, for his general health examination. (R. 8, at PageID.391.) His back pain had grown worse, he reported, yet there was no stiffness. (R. 8, at PageID.391-392) He also mentioned wheezing, but he denied shortness of breath, chest tightness, cough, and fatigue. (R. 8, at PageID.392.) He continued his regular walking exercise routine. (R. 8, at PageID.391.) The physical examination results were normal; in particular, he had normal bulk and tone in his arms and leg; good posture and benign spine; normal gait, reflexes,[8] and fine motor skills;

---

[8] The reflex results for each extremity were reported as "+2, equal and present." (R. 8, at PageID.395.) The "+2" indicates "a brisk response; normal." H. Kenneth Walker, *Clinical Methods: The History, Physical, and Laboratory Examination*, 365 (1990).

normal respiratory and cardiovascular systems; and no other abnormalities. (R. 8, at PageID.393-395.)[9]

In June 2015, he complained of increasing back pain, snoring, and apneic events. (R. 8, at PageID.500.) The apnea and snoring disrupted his sleep and led to fatigue, he reported. (*Id.*) His lumbar spine was tender on examination and had ropey tissue changes. (R. 8, at PageID.502.) In addition, his straight leg raise test was positive on his right side. (*Id.*) But his reflexes and coordination were normal, and he was properly oriented and alert. (*Id.*) The following month he presented with snoring, hyperlipidemia, apneic events, and dyspnea; but he made no musculoskeletal complaints and the examination results reported none. (R. 8, at PageID.513-514.) The examination revealed no respiratory or cardiovascular abnormalities. (R. 8, at PageID.515.)

He followed up in September with additional complaints of sleep apnea and back and shoulder pain. (R. 8, at PageID.520.) He denied any shortness of breath, cough, apneic events, edema, or chest tightness. (R. 8, at PageID.521.) The back pain sometimes woke him at night. (R. 8, at PageID.521.) It emanated from his lower back into his right buttock and calf. (*Id.*) The complaint was "moderate" and caused only moderate limitations on activities; he could still bear weight. (*Id.*) Lifting and activity exacerbated the pain, while rest alleviated it. (*Id.*) The "extent of symptoms include stiffness." (*Id.*) As for the shoulder, the pain had begun three years ago while he was lifting heavy duffle bags at work. (*Id.*) "[A]ctivity moderation and NSAID[s]" helped. (*Id.*) Examination revealed right shoulder

---

[9] The next session at which Plaintiff sought treatment occurred on March 20, 2015 and was for hypertension. (R. 8, at PageID.483.) No physical examination was recorded.

pain with overheard reaching and abduction, tenderness, and some weakness. (R. 8, at PageID.522.) His lumbar spine was also tender. (*Id.*) The respiratory and cardiovascular examination results were normal, and he was properly oriented. (R. 8, at PageID.522.) Dr. Hasegawa prescribed a pain medication, ordered physical therapy, and scheduled a steroid injection for Plaintiff. (R. 8, at PageID.523.)

Plaintiff's annual maintenance examination with Dr. Hasegawa was on October 20, 2015. (R. 8, at PageID.527.) He continued to regularly exercise by walking. (*Id.*) He complained of back pain, but not stiffness. (R. 8, at PageID.528.) He also reported wheezes, but denied shortness of breath, chest tightness, and cough. (*Id.*) Except for lumbar spine tenderness, the musculoskeletal, cardiovascular, respiratory, and neurological results of his physical examination were normal: his arms and legs had normal bulk and tone, his gait was normal, he had good posture, his reflexes were normal, and he had normal motor skills. (R. 8, at PageID.529-531.) Dr. Hasegawa wrote that the examination had no abnormal findings, and the only plan (aside from scheduled blood tests) was to return in a year and as needed. (R. 8, at PageID.531-532.)

His next visit, in March 2016, dealt with his complaints of trigger finger, without mention of back pain, issues with extremities, sleep apnea, or asthma. (R. 8, at PageID.536-542.) Aside from issues with his finger, the examination results were normal. (R. 8, at PageID.538.) Six months later, he returned to Dr. Hasegawa with back pain, which he hoped to treat using a TENS unit. (R. 8, at PageID.543.) The pain now radiated downward to both legs. (*Id.*) Activity, bending, and exertion aggravated his back; heat and rest alleviated it. (*Id.*) His activities were "moderately limit[ed]." (*Id.*) But his extremities were

13

not weak and he specifically denied shoulder weakness. (Id.) The relevant examination notes state that he had tenderness in the lumbar spine and the straight-leg raise tests were positive for the right leg. (R. 8, at PageID.545.) Otherwise, his results were normal. (R. 8, at PageID.544-545.) Dr. Hasegawa diagnosed intervertebral disc degeneration in the lumbar spine and lumbago with sciatica on the right side. (Id.) She ordered a TENS unit and physical therapy to instruct Plaintiff on its use. (Id.)[10]

Two months later, Plaintiff reported that the TENS unit "works well for him and provides adequate relief of his symptoms," and the medication and rest helped as well. (R. 8, at PageID.562.) The pain remained but had improved. (Id.) Nonetheless, he stated that it was "moderate and severe at times," with symptoms of stiffness and muscle spasm. (Id.) For the first time, he also complained about concentration issues. (Id.) He denied cough and fatigue. (Id.) The examination results were as follows: "tender @ lumbar spine, ropey tissue texture changes, decreased flexion, decreased lateral bending bilaterally and decreased rotation bilaterally," along with antalgic gait[11]; no cardiovascular or respiratory issues; and proper orientation and affect. (R. 8, at PageID.564.)

Dr. Hasegawa provided an opinion statement in February 2017. (R. 8, at PageID.569-571.) She stated that Plaintiff could occasionally lift and carry only 15 pounds. (R. 8, at PageID.569.) He could "stand and/or walk" for 2 hours in an 8-hour workday, sit

---

[10] The notes from Dr. Hasegawa's 2016 general maintenance examination, which occurred in October, do not include results of the physical examination. (R. 8, at PageID.550-554.) However, Plaintiff's lumbar disc degermation was noted in the list of diagnoses. (R. 8, at PageID.551.)

[11] An antalgic gait "is characterized by avoidance of weight bearing on the" side affected by pain. Gerard Malanga & Joe DeLisa, "Clinical Observation," in Joel DeLisa, et al., Gait Analysis in the Science of Rehabilitation, 6 (1998).

for 3 hours in the same period, and could, without interruption, walk for only 15 minutes and sit for 30 minutes. (*Id.*) The preprinted form provided spaces for Dr. Hasegawa to explain the medical evidence supporting the above conclusions, but she left these spaces blank. (*Id.*) He could occasionally (i.e., up to one-third of a workday) do the following: climb stairs, balance, stoop, crouch, kneel, crawl, reach, handle, push and pull, and bend, but he could never climb ladders. (R. 8, at PageID.570.) Plaintiff also had various "environmental restrictions" that were vaguely listed as including heights, moving machinery, temperature extremes, chemicals, dust and fumes, and humidity. (*Id.*) The pain would not allow Plaintiff "to concentrate or sustain activity over a prolonged period," nor would he be able to manage a sedentary job without needing several unscheduled rest breaks. (R. 8, at PageID.571.) Out of every 20 days, Plaintiff would miss 10 to 12. (*Id.*) In short, Plaintiff was totally disabled from full-time work, according to Dr. Hasegawa. (*Id.*)

### 2.    Application Reports and Administrative Hearing

### i.    Plaintiff's Reports

Plaintiff completed a function report on January 6, 2014. (R. 8, at PageID.198.) In it, he premised his inability to work on shortness of breath when walking, bending, and lifting and on back and hip pain that made it hard to stand, walk, or sleep. (*Id.*) On a typical day, he went for a short walk, dressed and showered, completed chores, ran errands, went on the computer, listened to music, watched television, had meals, talked on the phone, and occasionally went out. (R. 8, at PageID.192.) Before becoming disabled, he could run, lift, bend, "walk distances," and sit for longer periods, among other things. (*Id.*) Now he could not do these things. (*Id.*)

He had no problems with personal care, nor did he need reminders to groom. (R. 8, at PageID.192-193.) But his wife needed to remind him to take his medications. (R. 8, at PageID.193.) Meals he could prepare included "sandwiches, simple grilling, eggs, frozen dinners, [and] cereal." (*Id.*) For a half hour to one hour each week he did housework, such as "simple cleaning, some repairs, [and] self propelled mowing with frequent breaks." (*Id.*)

He went outside daily and travelled by walking, driving, or riding in a car. (R. 8, at PageID.194.) Once a week he shopped for about 45 minutes. (*Id.*) He had no problem handling money or finances. (*Id.*) Hobbies included computers, music, and television, but after sitting for 30 minutes while engaged in these activities, he needed to rise. (R. 8, at PageID.195.) His once-a-week social activities involved going out to eat, listening to music, or "computers." (*Id.*)

His illnesses impaired various abilities: lifting (which was limited to 8 to 10 pounds), squatting, bending, standing (for 5 to 10 minutes), reaching (head level), walking (for 10 minutes on a smooth level surface), sitting (for 20 to 30 minutes), kneeling (for 1 minute), stair climbing (due to right knee pain), completing tasks, concentrating (for 5 minutes), and memorizing (particularly his short-term memory). (R. 8, at PageID.196.) Both written and verbal instructions posed some problems for Plaintiff, but he had no issues with authority figures, had never been fired due to interpersonal conflict, and handled stress and changes to his routine well. (R. 8, at PageID.197.) He did not need an assistive device to walk. (*Id.*)

### ii.        Plaintiff's Testimony at the Administrative Hearing

At the hearing held on February 9, 2017, Plaintiff testified that he retired as a corrections officer in May 2012. (R. 8, at PageID.60.) At the job, he was a transportation officer responsible for taking prisoners and their property to courts, hospitals, and other correctional facilities. (R. 8, at PageID.66.) This required strip searching the inmates, chaining them, and moving their 100- to 150-pound footlockers. (R. 8, at PageID.67.) He stood or walked for most of his shift, roughly four to five hours a day. (*Id.*) Chaining the prisoners required him to bend over to attach the leg irons. (R. 8, at PageID.68.)

After retirement, he had worked occasionally. (R. 8, at PageID.60.) Four days a year he was a part-time marine sheriff's deputy, a position he had held since 1999. (R. 8, at PageID.61.) As a deputy, he attended special events and gave "direction, things like that, helping, just making things run smoother so people get where they've got to be." (*Id.*) The shifts were six to eight hours long, most of which was spent on his feet. (R. 8, at PageID.69.) He also had to move debris weighing as heavy as 35 to 50 pounds. (*Id.*) The day after one of these special events was spent recuperating, and he doubted he could work two days in a row. (R. 8, at PageID.71-72.)

Also, for the last year-and-a-half he had worked for the U.S. Marshals as a district security officer. (R. 8, at PageID.70.) It was an on-call position that required about six to eight workdays a year, with shifts usually lasting eight hours, sometimes longer. (R. 8, at PageID.70-71.) On those days, he would remain at a hospital while a prisoner completed a medical procedure and then notify the transport to come pick him up. (R. 8, at PageID.70.) While working, he would alternate between sitting and standing. (R. 8, at PageID.71.)

17

His 2012 retirement was caused by unrelenting lower back pain that radiated down his right leg to his ankle. (R. 8, at PageID.62.) The pain grew worse when he sat for more than 30 minutes or stood for longer than 5 or so. (*Id.*) He could walk for 10 to 12 minutes. (*Id.*) Bending was troublesome, and his wife often had to tie his shoes. (R. 8, at PageID.63.) The pain eased when he used a hot compress or his TENS unit, and when he relaxed in his lounger, which he did for 2 to 3 hours a day in 45-minute segments. (*Id.*) In the past, he had gone to physical therapy, where he had learned stretching techniques to manage the pain. (R. 8, at PageID.66.) Medications dulled the pain but also caused drowsiness. (R. 8, at PageID.64.) Two or three days a week the pain was so intense that he did not leave home. (*Id.*) The pain also affected his sleep, limiting him to around four hours each night, which he supplemented by napping during the day. (R. 8, at PageID.65.) At home, his wife did the yardwork and a neighbor shoveled snow. (R. 8, at PageID.64.) He would help dry dishes, but that took only a few minutes. (*Id.*)

He also experienced memory and concentration problems, as well as bladder difficulties. (R. 8, at PageID.65.) Additionally, he had asthma and used an inhaler. (R. 8, at PageID.71.) Plaintiff also testified that his left shoulder hurt, but he had not seen a doctor about or ever had a diagnosed condition regarding either arm or shoulder. (R. 8, at PageID.81.)

### iii.        The VE's Testimony at the Administrative Hearing

The VE then testified. (R. 8, at PageID.73.) She first asked for clarification about his corrections officer work. (*Id.*) From 2000 until he retired in 2012, Plaintiff explained that he worked as a transporter; before that, he worked inside the prison. (R. 8, at

PageID.73-74.) The VE then testified that the transporter position "is just that, a transporter . . . falling under a security guard kind of position." (R. 8, at PageID.74.)

The VE then stated that the "correction's officer transporter position" was identified by the Dictionary of Occupational Titles (DOT) code number 372.677-010. (R. 8, at PageID.74-75.) It was classified as light exertional job, but the VE deemed it "very heavy as performed by [Plaintiff] . . . per his description" (R. 8, at PageID.75.) The security guard position was also a light exertion position under DOT. (*Id.*)

The ALJ then asked the VE to consider a hypothetical individual with Plaintiff's

age, education, and work experience [who] can perform work at the light exertional level. The individual can occasionally stoop, kneel, crouch, and crawl, and frequently balance. Can occasionally climbs stairs and ramps. Can never climb ladders, ropes, and scaffolds. And can never be exposed to vibrations, unprotected heights, and moving machinery parts. Assume that the individual can have occasional exposure to dust, odors, fumes, pulmonary irritants, extreme cold, extreme heat, humidity, and wetness.

(R. 8, at PageID.75.) Could that person perform Plaintiff's past work, either as it is generally performed or as Plaintiff performed it? (R. 8, at PageID.76.) The VE concluded that the individual could work in the transport position. (*Id.*) As for the marine deputy job, the individual could not perform it because it required exposure to outdoor weather; the U.S. Marshal position could be performed as Plaintiff performed it, but not as it is generally performed due to the frequent exposure to weather. (*Id.*) Were there any other jobs in the national economy that the hypothetical individual could perform? (*Id.*) There were three: general office clerk (230,000 positions nationally); cashier (1 million positions nationally); and bench or table assembly production (94,000 positions nationally). (R. 8, at PageID.76, 78.)

None of these jobs would be available if the individual was also restricted to occasional use of his arms for reaching, pushing, pulling, and handling. (R. 8, at PageID.80.) Likewise, if he needed 3 unscheduled breaks for 30 to 60 minutes each day, no jobs would be open to him. (*Id.*) And if the individual was off-task and produced at 80 percent of an average worker's rate, he would also be precluded from work. (*Id.*)

The ALJ then posed a second hypothetical:

[A]ssume an individual the Claimant's age, education [sic], and work experience is able to perform work at the sedentary exertional level except the individual must be allowed to alternate between standing or walking and sitting every 30 minutes while remaining on task. Assume that the individual can occasionally kneel, crouch, stoop, balance, crawl, and occasionally climb stairs and ramps, and never climb ladders, ropes, or scaffolds. He can never be exposed to vibrations, unprotected heights, and moving mechanical parts. Assume that the individual can have occasional exposure to dust, odors, fumes, pulmonary irritants, extreme cold, extreme heat, humidity, and wetness. In addition, assume that the individual is able to understand, carry out, and remember simple instructions, and make simple work-related decisions. Finally assume that the individual would be absent from work more than ten days per month. Would the individual be able to perform the Claimant's past relevant work either . . . as he actually performed the work or as those occupations are generally performed in the national economy?

(R. 8, at PageID.77.) The absenteeism rate would preclude work in the national economy, the VE stated; however, the marine deputy and the U.S. Marshal positions could be performed because they occurred so infrequently. (R. 8, at PageID.78.) One missed day a month was the most employers would accept. (R. 8, at PageID.80.)

20

### F.      Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations[12] carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513 (2016). "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a) (2016). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d) (2016). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the

---

[12]   Various amendments have been made to the regulations since Plaintiff filed his claim. *See, e.g.*, Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01 (January 18, 2017) (effective March 27, 2017). Because the changes do not alter the outcome here—and, relatedly, they do not appear to exercise an impermissible retroactive effect on Plaintiff's rights, as the amendments are largely procedural changes in the process for analyzing evidence, *cf. Combs v Comm'r of Soc. Sec.*, 459 F.3d 640, 647 (6th Cir, 2006)—and the parties do not discuss them, it is unnecessary to determine whether they apply. Therefore, like many other courts, I will utilize the regulations in effect when Plaintiff filed his claim and the case was decided by the ALJ, along with the new regulations that explicitly apply to claims during this period. *See, e.g.*, 20 C.F.R. § 404.1527; *see generally* Revisions to Rules Regarding the Evaluation of Medical Evidence, 81 Fed Reg. 62560, 62578 (September 9, 2016); *see also Rodriguez v. Colvin*, 3:15CV1723, 2018 WL 4204436, at *4 n. 6 (D. Conn. 2018) ("[T]he Court reviews the ALJ's decision under the earlier regulations because the plaintiff's application was filed before the new regulations went into effect." (citing *Maloney v. Berryhill*, No. 16-cv-3899, 2018 WL 400772, at *1 (E.D. N.Y. 2018) (same))); *Miller v. Comm'r of Soc. Sec.*, No. 1:17CV0718, 2018 2773372, at *5 n. 3 (N.D. Ohio 2018) ("Plaintiff's claim was filed before March 27, 2017, and the ALJ's decision was rendered before the new regulations took effect. For the sake of consistency, the court continues to cite the language from the former regulations that were in effect at the time of the ALJ's decision."), *rep. & rec. adopted by* 2018 WL 2766020 (N.D. Ohio 2018); *Woodall v. Berryhill*, No. 1:17-cv-01289, 2018 WL 3133442, at *7 n. 3 (N.D. Ohio 2018) (applying the rules effective when the claimant applied for benefits), *rep. & rec. adopted by* 2018 WL 3126552 (N.D. Ohio 2018); *Meeks v. Comm'r of Soc. Sec.*, No. 4:17-cv-45, 2018 WL 1952529, at *4 n. 2 (E.D. Tenn. 2018) (applying the rules effective when the ALJ decided the case).

individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Because Plaintiff filed his claim before March 27, 2017, he is entitled to the benefit of the treating-source rule.  Under that rule, certain opinions from his treating physicians can receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(c)(2). Therefore, the ALJ does not owe a

treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d). Thus, the ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits must give specific reasons, supported by record evidence, for the weight granted to a treating source's opinion. *Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must also analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996).[13] Credibility determinations regarding a claimant's subjective complaints rest

---

[13] Although the Commissioner has rescinded SSR 96-7p and eliminated the term "credibility" from Administration policy, SSR 16-3p, 2016 WL 1119029, at *1 (Mar. 16, 2016), the underlying regulation has remained materially unchanged, *see* 20. C.F.R. § 404.1529(c), and I agree with the courts in this District that have continued to apply SSR 96-7p to cases arising prior to its rescission. *See, e.g.*, *Cooper v. Comm'r of Soc. Sec.*, No. 16-cv-13477, 2017 WL 3923984, at *3 (E.D. Mich. August 21, 2017), *Rep. & Rec. adopted by* 2017 WL 3891971 (E.D. Mich. Sept. 9, 2017); *Tuttle v. Comm'r of Soc. Sec.*, No. 16-11144, 2017 WL

23

with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529(a) (2016); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529 (2016); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments will "not alone establish that [he or she is] disabled." 20 C.F.R. § 404.1529(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply

---

2928021, at *6 n. 3 (E.D. Mich. June 9, 2017), *Rep. & Rec. adopted by* 2017 WL 2905125 (E.D. Mich. July 7, 2017).

because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective, confirming evidence forces the ALJ to consider the following factors:

(i)     [D]aily activities;
(ii)    The location, duration, frequency, and intensity of . . . pain;
(iii)   Precipitating and aggravating factors;
(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)     Treatment, other than medication, . . . received for relief of . . . pain;
(vi)    Any measures . . . used to relieve . . . pain.

20 C.F.R. § 404.1529(c)(3) (2016); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

### G.     Arguments and Analysis

Plaintiff makes two arguments. The first deals with the need for a medical opinion to support the RFC. The second involves the VE's testimony. For the reasons that follow, I find neither argument persuasive.

#### 1.     Treating Physician Rule

##### a.     Parties' Arguments

Plaintiff's first argument is that the ALJ erred by failing to give the opinion of his treating physician, Dr. Hasegawa, controlling weight. (R. 12, at PageID.589.) The ALJ did not cite any testing that contradicted the medical opinion, which in fact finds support in all the objective testing, according to Plaintiff. (R. 12, at PageID.591.) The March 2012 MRI showed disc herniation as well as degenerative disc bulges and desiccation. (R. 12, at

PageID.592, citing (R. 8, at PageID.276).) Earlier x-rays also revealed severe degenerative disc disease. (*Id.*, citing (R. 8, at PageID.278).)

Dr. Hasegawa's notes likewise support her opinion, Plaintiff continues. (R. 12, at PageID.593.) They contain multiple complaints of back pain, abnormal gait, spinal tissue changes, straight leg raising tests, tenderness, and reduced range of motion. (*Id.*, citing (R. 8, at PageID.502, 545, 563-564).) The normal findings the ALJ relies on relate to his heart and breathing problems rather than his back. (*Id.*, citing (R. 8, at PageID.48).) Further, the ALJ also took statements out of context, not recognizing the qualifications on assertions that he was asymptomatic or that treatment was effective. (R. 12, at PageID.593-594, citing (R. 8, at PageID.320, 562).) Likewise, the medical opinion from Dr. Jilani supports Dr. Hasegawa's conclusion. (R. 12, at PageID.594-595, citing (R. 8, at PageID.270).) Without any support, the ALJ's RFC amounts to his own interpretation of the medical data. (R. 12, at PageID.595, citing *Childress v. Berryhill*, No. 1: 16-CV-00119, 2017 WL 758941 (W.D. Ky. Feb. 27, 2017); *McCaig v. Comm'r of Soc. Sec.*, No. 16-11419, 2017 4211047 (E.D. Mich. Aug. 25, 2017), *rep. & rec. adopted by* 2017 WL 4176734 (E.D. Mich. Sept. 21, 2017).)

Defendant believes the ALJ's appropriately analyzed Dr. Hasegawa's opinion. (R. 14, at PageID.617.) First, Dr. Hasegawa failed to support her opinion with objective evidence even though the form on which the opinion appeared provided spaces for her to explain the evidence supporting the opinion. (*Id.*) These spaces were left blank. (R. 14, at PageID.618, citing (R. 8, at PageID.569).) At most, she linked a few diagnoses to some limitations; but a diagnosis by itself cannot establish the extent of a limitation. (*Id.*, citing

26

*Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988).) None of the diagnoses, for example, explain the reaching and handling limitations Dr. Hasegawa assessed. (*Id.*)

Second, Defendant argues that the medical evidence clashes with the treating opinion. (*Id.*) Numerous examinations resulted in normal findings. (R. 14, at PageID.618-619 (citations omitted).) And Plaintiff sometimes, "if not consistently," denied certain symptoms like fatigue, chest pain, stiffness, weakness, and cough, and also contradicted Dr. Hasegawa's limitations. (R. 14, at PageID.619-620, citing (R. 8, at PageID.269, 320, 354, 377, 413-414, 513-514, 521, 528, 537, 544-545, 562-565).) Third, Plaintiff admitted engaging in activities—such as driving to appointments, exercising, shopping, and making simple meals—that were inconsistent with Dr. Hasegawa's limitations. (R. 14, at PageID.620 (citations omitted).)[14] Further, the ALJ reasonably relied on Plaintiff's occasional employment after he allegedly became disabled, which sometimes required him to lift 35 to 50 pounds. (*Id.*)[15]

Defendant contends that the ALJ did not cherry pick the evidence regarding Plaintiff's back problems, but properly cited abnormal as well as normal examination findings. (R. 14, at PageID.622.) He was entitled to find the normal results more credible,

---

[14] Plaintiff replies that the ALJ ignored other statements that he could stand and walk for at most 10 minutes and could not leave home 2 to 3 days a week. (R. 15, at PageID.637.)

[15] In reply, Plaintiff states that he did not lift those heavy weights while working, but rather dragged debris floating on the water. (R. 15, at PageID.638.) He worked one day, and had to recuperate the next. (*Id.*) Further, Plaintiff states that his testimony is consistent with Dr. Hasegawa's opinion on this:

> Mr. Charbonneau testified two days per week the severity of his pain prevents him from leaving his house (Tr.40) but on other days (approximately 1 per week), he has been able to go to work (Tr.47-48). This is completely consistent with Dr. Hasegawa's opinion that Plaintiff would miss about ½ of the work days in a typical month (Tr. 538).

(R. 15, at PageID.635-635).

Defendant argues. (*Id.*) That the ALJ did not use another medical opinion to construct the RFC merely reflects that there was no such opinion, other than Dr. Hasegawa's, in the record. (*Id.*) The Sixth Circuit does not require that RFCs mirror medical opinions. (R. 14, at PageID.622-623, citing *Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732F. App'x 395, 2018 WL 2017564, at *5 (6th Cir. 2018).)[16]

### b.    Application

The initial thrust of Plaintiff's argument is that, in rejecting Dr. Hasegawa's opinion, the ALJ cited neither countervailing medical opinions nor objective evidence. It is true that Dr. Hasegawa's was the only direct medical opinion on Plaintiff's functional capacity. But, as explained below, I disagree that the ALJ committed error requiring remand.

### 1.    RFCs and Medical Opinions

Plaintiff claims that because the ALJ cited no other medical opinions, the RFC must "rely only on his own assessment of the raw medical data." (R. 12, at PageID.595.) The implication is that medical opinions must prop up the RFC.

The Sixth Circuit has rejected a *per se* rule that ALJs must employ supporting medical opinions when constructing the RFC. As it recently noted, the court has declined to adopt "the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ." *Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018); *see also Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 442 (6th Cir. 2017)

---

[16] Plaintiff responds that this caselaw is inapposite because the court relied on other medical evidence that supported the RFC. (R. 15, at PageID.639.) Here, according to Plaintiff, no such evidence exists.

(rejecting the argument that "the ALJ's RFC lacks substantial evidence because no physician opined that Shepard was capable of light work"). The rationale is that the ALJ has final responsibility for determining the RFC. *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013) (citing SSR 96-5p, 1996 WL 374183 (July 2, 1996); *see also* 20 C.F.R. § 404.1527(d)(2) (2016) (noting that no "special significance" is given to medical opinions on a claimant's RFC). As such, "to require the ALJ to base her RFC finding on a physician's opinion, 'would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled.'" *Id.* (quoting SSR 96-5p, 1996 WL 374183, at *2).

A tension, however, is immediately apparent between the ALJ's responsibility for constructing the RFC and the ALJ's lay status, which makes medical source opinions useful, at the very least, in translating evidence of ailments into concrete functional limitations. In addressing this problem, the first thing to note is the close overlap between medical source opinion statements and RFC assessments. The former are "statement[s] about what you can still do despite your impairment(s) based on the acceptable medical source's findings." 20 C.F.R. § 404.1513(b)(6); *see also* SSR 96-5p, 1996 WL 374183, at *4 (quoting the regulation and stating that the medical source statement is a 'statement about what you can still do despite your impairment(s)' made by an individual's medical source and based on that source's own medical findings"). The RFC, in turn, "is the most you can still do despite your limitations." 20 C.F.R. § 404.1545(a)(1). Thus, the ALJ owes

a medical source no special deference when deciding what a claimant can do despite his or her limitations; at the same time, medical sources give opinions on the same matter, and when they come from treating sources and involve the nature and severity of an impairment, the opinion might even be owed controlling weight. 20 C.F.R. § 404.1527(c)(2); SSR 96-5p, 1996 374183, at *5 ("Although the overall RFC assessment is an administrative finding on an issue reserved to the Commissioner, the adjudicator must nevertheless adopt in that assessment any treating source medical opinion (i.e., opinion on the nature and severity of the individual's impairment(s)) to which the adjudicator has given controlling weight under the rules in 20 CFR 404.1527(d)(2) and 416.927(d)(2).").

The Commissioner has attempted to distinguish medical source statements and RFC assessments on two similar grounds. The first, and more superficial, is that though a medical source statement may use terminology identical to that used in the regulations— such as "light work" or "sedentary work"— the medical source may not be using the terms in the same way. SSR 96-5p, 1996 WL 374183, at *5. The second is a more fundamental distinction: "The judgment regarding the extent to which an individual is able to perform exertional ranges of work [for example] goes beyond medical judgment regarding what an individual can still do and is a finding that may be dispositive of the issue of disability." *Id.* In other words, the RFC reflects a vocational analysis in which medical sources have no special expertise.

Still, the vocational analysis—what work the claimant can handle—depends directly on the claimant's physical and mental capability, which are topics in the medical sources' bailiwick. *See generally Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908, 911

30

(N.D. Ohio 2008) ("Critical to this residual functional capacity finding are residual capacity opinions offered by medical sources . . . ."). As a result, translating the medical evidence of a claimant's physical and mental limitations into an RFC cannot be wholly divorced from medical expertise—an expertise that ALJs lack.

Indeed, Magistrate Judge Anthony Patti has thoroughly compiled caselaw from this District and beyond standing for the "general principle that the ALJ 'must generally obtain a medical expert opinion' when formulating the RFC unless the '"medical evidence shows relatively little physical impairment' such that the ALJ can permissibly render a commonsense judgment about functional capacity[.]'" *Gross v. Comm'r of Soc. Sec.*, 247 F. Supp. 3d 824, 828 (E.D. Mich. 2017) (citations omitted). In one such case, the Second Circuit stated,

> [I]n this case the Commissioner failed to offer and the ALJ did not cite any medical opinion to dispute the treating physicians' conclusions that Balsamo could not perform sedentary work. In the absence of a medical opinion to support the ALJ's finding as to Balsamo's ability to perform sedentary work, it is well-settled that "the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion. . . . [W]hile an [ALJ] is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who [submitted an opinion to or] testified before him."

*Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (citations omitted); *see also McCaig on behalf of McCaig v. Comm'r of Soc. Sec.*, No. 16-11419, 2017 WL 4211047, at *8 (E.D. Mich. Aug. 25, 2017) (noting caselaw), *rep. & rec. adopted by* 2017 WL 4176734 (E.D. Mich. Sept. 21, 2017); *Allen v. Comm'r of Soc. Sec.*, No. 12-15097, 2013 WL 5676254, at *15-16 (E.D. Mich. Sept. 13, 2013) ("Simply put, no other treating physician (other than Dr. Henderson in March 2008) or consulting or examining physician offered any other

31

opinions regarding plaintiff's functional limitations. Thus, we are left with the circumstance of the ALJ interpreting raw medical data to arrive at a residual functional capacity determination, without the benefit of an expert medical opinion. . . . The undersigned recognizes that there are limited occasions when the medical evidence is so clear, and so undisputed, that an ALJ would be justified in drawing functional capacity conclusions from such evidence without the assistance of a medical source."), *rep. & rec. adopted by* 2013 WL 5676251 (E.D. Mich. Oct. 18, 2013); *Deskin*, 605 F. Supp. 2d at 912 (recognizing that a medical opinion is unnecessary when the evidence is clear and susceptible to commonsense judgments, but noting that an "ALJ is not qualified to assess a claimant's RFC on the basis of bare medical findings, and as a result an ALJ's determination of RFC without a medical advisor's assessment is not supported by substantial evidence").

The underlying reason for this rule is that ALJs are lay persons, not experts capable of meaningfully sifting through the shapeless mass of medical data. *See Brown v. Comm'r of Soc. Sec.*, 602 F. App'x 328, 331 (6th Cir. 2015) ("[A]n ALJ should resist the temptation to substitute the ALJ's own interpretation of medical records for that of a physician who has examined the records."); *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) ("As a lay person, however, the ALJ was simply not qualified to interpret raw medical data in functional terms and no medical opinion supported the determination."); Carolyn A. Kubitschek & Jon C. Dubin*, Soc. Sec. Disability Law & Proc. In Fed. Cts.*, § 6:24 (April 2018) ("One error which ALJs frequently make is to reach their own medical conclusions about the evidence. ALJs, as lay people, are not permitted to substitute their own opinions for opinions of physicians."). As one court noted, "The medical expertise of the Social

Security Administration is reflected in regulations; it is not the birthright of the lawyers who apply them. Common sense can mislead; lay intuitions about medical phenomena are often wrong." *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990).

This line of cases—requiring medical opinions for most RFCs—is "somewhat at odds" with the unreported Sixth Circuit caselaw noted above, holding that the ALJ does not need to mold the RFC from medical opinions. *McCaig*, 2017 WL 4211047, at *8; *Gross*, 247 F. Supp. 3d at 829. Reconciling these strands, one court in this District has held that an RFC need not be entirely based on a medical opinion as long as it was "supported by substantial evidence and not merely the ALJ's own medical interpretation of the record." *Gross*, 247 F. Supp. 3d at 829. Under this approach, the court must also examine whether the medical evidence of impairment was simple enough that the ALJ could come to a "commonsense judgment" about the RFC. *Id.* at 830.

Other courts have gone further in rejecting a rule that would find error if the RFC is made without the benefit of a physician's medical opinion. In one such opinion, the court grounded the analysis on whether the ALJ logically connected the evidence with the conclusions reached. *McCaig*, 2017 WL 4211047, at *9. The court noted that the reasons for fearing the ALJ's lay interpretation of medical evidence are less persuasive when the ALJ has rejected or discounted opinion evidence—in that case, there was "some medical opinion evidence from which the ALJ may extrapolate to form her own RFC without interpreting raw medical data." *Id.* at *8.

Another court employing a similar approach noted that the claimant has the burden of bringing forward evidence and that the RFC is the ALJ's to decide. *Woelk v. Comm'r of*

33

*Soc. Sec.*, No. 13-12411, 2014 WL 2931404, at *8 (E.D. Mich. May 15, 2011). Accordingly, it held that "[t]he fact that the ALJ did not cite to any medical opinion in formulating his RFC—but, instead, relied on Woelk's testimony and the available medical evidence—is not per se grounds for error." *Id.* Further, the court found, the ALJ did not examine the "'raw medical data' (such as MRI results)," but rather "relied on the medical treatment notes—as well as Woelk's own testimony—in formulating an RFC assessment[.]" *Id.*

I find *McCaig* and *Woelk* persuasive, as is *Gross* to the extent it recognizes there is no *per se* requirement that ALJs obtain medical opinions. At base, all three cases ask whether substantial evidence supports the RFC, though *Gross* appears to give greater force to the warning that ALJs should not meddle with raw medical data. The statutory framework supports this approach. It charges the courts with reviewing the Commissioner's findings for "substantial evidence." 42 U.S.C. § 405(g). Nowhere do the statutes or regulations mandate that ALJs obtain medical opinion evidence before devising the RFC. Along these lines, the Sixth Circuit has stated that none of the cases admonishing ALJs against substituting views of the data for a physician's "even remotely suggests that an ALJ must, as a matter of law, seek out a physician's medical opinion where one is not offered." *Brown*, 602 F. App'x at 331. This holding hints at yet another reason ALJs are not required obtain medical opinions before starting in on the RFC: the claimant bears responsibility for providing evidence establishing disability. 20 C.F.R. § 404.1512(a) ("In general, you have to prove to us that you are blind or disabled. You must inform us about or submit all evidence known to you that relates to whether or not you are blind or

disabled."); *see also Woelk*, 2014 WL 2931404, at *6 ("To begin with, Woelk did not provide any medical opinion from the relevant time period that established any workplace limitations arising from his impairments. The regulations explicitly provide that it is the claimant who bears the burden of establishing the existence of disability.").

Further, while the ALJ has a duty to fully develop the record, *Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1051-1052 (6th Cir. 1983), the ALJ's specific obligations with regard to soliciting information from medical sources changed somewhat in March 2012 with amendments to 20 C.F.R. § 404.1512(e) (2011). Before then, ALJs were required to recontact medical sources if the evidence those sources provided was inadequate. *Id.*; *see also Hollis v. Comm'r of Soc. Sec.*, No. 13-13054, 2015 WL 357133, at *23 (E.D. Mich. Jan. 27, 2015) (discussing the old rule). Even so, courts did not interpret the old rule to mandate recontact when no opinion evidence existed, but only when the submitted evidence was inadequate to make the disability determination. *Hollis*, 2015 WL 357133, at *23 (citing *Borg v. Comm'r of Soc. Sec.*, No. 11–11210, 2011 WL 6955719, at *6 (E.D. Mich. Dec.11, 2011)).

Amendments in 2012 turned the mandate to recontact into a discretionary option for ALJs. *Id.* at *24. Now, it is not *per se* error to decline recontacting a medical source, and even when such action was required, the driving need was not for a medical opinion but for sufficient evidence and clarity to decide disability. This development of the recontact rule, then, provides support for the notion that the undergirding goal is developing substantial evidence regardless of the form that evidence comes in.

For these reasons, I do not find any brightline rule that medical opinions must be

the building blocks of the RFC. As *McCaig* and *Gross* emphasized, however, "the ALJ remains obligated to make a logical bridge between the evidence relied on and the conclusion reached. . . . Regardless of whether the ALJ was required to obtain a medical RFC, ' . . . in order to make a decision on this issue, this Court "may not uphold an ALJ's decision, even if there is enough evidence in the record to support it, if the decision fails to provide an accurate and logical bridge between the evidence and the result."'" *McCaig*, 2017 WL 4211047, at *9 (quoting *Gross*, 247 F. Supp. 3d at 829).

Consequently, it very well could be the case that without a medical opinion, the ALJ's RFC will lack substantial evidence. But the failure in such cases is not simply the missing medical opinion but because the ALJ has failed to adequately explain how the extant evidence translates into the RFC's functional limitations. That is, in practice, medical opinions might often be indispensable. But the analysis in any given case should go beyond merely asking whether there is such an opinion or not. Instead, it should, as in other cases, examine the ALJ's reasoning under the substantial evidence standard. This requires assessing the ALJ's rationales and the evidence they are built upon. It may involve asking whether, despite rejecting or discounting the only medical opinions in the record, the ALJ nevertheless used those opinions to extrapolate an RFC. *Cf. id.* at *8. Or it may require asking whether the ALJ attempted to divine limitations directly from evidence such as MRIs rather than the claimant's testimony. *Cf. Woelk*, at *8.

### 2.    Analysis

For the following reasons, I conclude that the ALJ did not err in giving limited weight to the treating physician's opinion, even though it was the only medical source

statement directly opining on Plaintiff's functional limitations.

As an initial matter, Dr. Hasegawa's form statement suffers from internal defects. Dr. Hasegawa ignored the spaces available to explain her determinations, leaving the opinion conclusory. The Sixth Circuit considers such opinions to be weak evidence. *See Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 474 (6th Cir. 2016) ("We have previously declined to give significant weight to rudimentary indications that lack an accompanying explanation."); *Duncan*, 801 F.2d at 855 (noting that the disability determination ultimately rests with the Commissioner and that, "[a]ccordingly, the [Commissioner] is not bound by a treating physician's conclusory statement"). Thus, it was appropriate for the ALJ to observe that "Dr. Hasegawa did not support her limitations with any objective findings." (R. 8, at PageID.48.)

Further, as the ALJ also noted, the opinion lacked a basis in Plaintiff's own assertions or Dr. Hasegawa's treatment notes. (*Id.*) The opinion limited Plaintiff's reaching and handling, (R. 8, at PageID.570), but Plaintiff testified that he had not yet seen a doctor or received a diagnosis regarding arm or shoulder pain, (R. 8, at PageID.81). Of course, Dr. Hasegawa could have established these limitations due to back pain, but it is unclear that she meant to do so because she failed to link the specific limitations to medical evidence or even diagnoses. Her failure to offer any explanation thus undermines the persuasiveness of these limitations.

The record, too, lacks corroborating evidence for the reaching and handling limitations. On the whole, physical examinations of Plaintiff's arms and shoulders produced normal results and revealed no abnormalities. (R. 8, at PageID.270, 393, 395,

415-416, 446, 529-531, 535, 538, 543.) In other records, he denied limitations on pushing, pulling, and gripping. (R. 8, at PageID.459.) On the rare occasion when he did present with shoulder pain, Plaintiff stated that treatment helped. (R. 8, at PageID.521-522.) And he later denied shoulder weakness. (R. 8, at PageID.543.)

As for Plaintiff's back pain, sleep apnea, and asthma, the ALJ sufficiently discussed the evidence demonstrating that Dr. Hasegawa's opinion was unfounded. For example, the ALJ raised the issue of Plaintiff's conservative treatment by observing that he was not prescribed pain medication until September 3, 2015, well after his onset date. (R. 8, at PageID.45, 523.) Before that, over-the-counter medications were used instead of prescriptions. (R. 8, at PageID.270.) Pain medication has been considered a conservative treatment plan. *See Rudd*, 531 F. App'x at 727 ("[H]is treatment [for extremity pain] was minimal and conservative during the period at question; [the claimant] was treated with medication only, and more recently simply over-the-counter medication.").[17] Even later in the record, when his complaints of back pain seemed to have increased, Plaintiff told Dr. Hasegawa that the TENS unit provided "adequate relief." (R. 8, at PageID.562.)

Further, while testing did display degenerative disc disease, (R. 8, at PageID. 275-276, 278, 467-468), the bulk of the treatment notes from Dr. Hasegawa and others show that he did not frequently complain of or evince limitations—such as reduced range of motion, respiratory problems, or fatigue—associated with his conditions, (R. 8, at PageID.269, 283, 320, 322, 335, 338, 355, 392-395, 403-405, 408, 413-417, 439-440, 444,

---

[17] At the same session, Dr. Hasegawa prescribed steroid injections, but there are no reports in the record that Plaintiff received them. (R. 8, at PageID.523.)

446, 459-460, 463, 465, 521, 529-531 (with some lumbar tenderness), 543.) On one occasion, he denied experiencing back pain. (R. 8, at PageID.459.) At other sessions, he mentioned that the pain had improved or his conditions were manageable. (R. 8, at PageID.269, 337, 443.) Other times, he noted increasing pain or apneic events but denied stiffness and had normal examination results (*e.g.*, normal range of motion and gait and no respiratory abnormalities); or he noted wheezing but denied shortness of breath or a cough. (R. 8, at PageID.391-395, 513-515, 528.) These generally positive examination results outweigh the abnormal ones. (R. 8, at PageID.502, 522, 545, 564.)

Thus, substantial objective evidence from examination reports, as well as Plaintiff's complaints, supports the ALJ's statement that the record, "including Dr. Hasegawa's own treatment notes," did not support the treating physician opinion. (R. 8, at PageID.48.) While evidence might also support Plaintiff's argument, "review on appeal is limited to determining whether substantial evidence supported" the ALJ's decision. *Mokbel-Aljahmi*, 732 F. App'x at 401. The ALJ appropriately highlighted the inconsistences between the examination results, the complaints, and Dr. Hasegawa's opinion. *Cf. Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000) ("[I]nternal inconsistencies may provide good cause to deny controlling weight to a treating physician's opinion[.]").

Similarly, the record contains estimates of Plaintiff's limitations that contradict Dr. Hasegawa's conclusions. For example, Dr. Hasegawa estimated that Plaintiff could sit for only 30 minutes without interruption, walk for only 15, and lift 15 pounds at most. (R. 8, at PageID.569.) While Plaintiff estimated roughly the same numbers in the adult function form he submitted to the Commissioner, (R. 8, at PageID.196), other records tell a different

39

story. In March 2012, when Dr. Hasegawa was recommending Plaintiff remain off work due to his back pain, (R. 8, at PageID.450), Dr. Jilani wrote that Plaintiff could "sit and drive for one hour, standing and laying down is not a problem, walking is not a problem, and he is lifting up to 40 pounds," (R. 8, at PageID.269). Around the same time, Plaintiff mentioned at physical therapy undefined "barriers" to standing and walking, but none for sitting, climbing stairs, lifting, or driving. (R. 8, at PageID.460.) And throughout his general examinations with Dr. Hasegawa, Plaintiff reported that he regularly walked for exercise. (R. 8, at PageID.391, 413, 527.)

The evidence of Plaintiff's current employment also illuminated Plaintiff's abilities. As a marine sheriff deputy, Plaintiff testified that he would move 35 to 50 pounds of debris. (R. 8, at PageID.69.) In his reply brief, Plaintiff argues that he never testified he lifted those weights, merely dragged them. (R. 15, at PageID.638.) But his testimony did not say "drag" or "lift"; rather he said he would "move" the debris to "clear the stuff out," and further he characterized it as "heavy." (R. 8, at PageID.69.) Consequently, the ALJ could reasonably conclude that Plaintiff's current position, despite being part-time, required him to move "heavy" items weighing upwards of 50 pounds, well in excess of Dr. Hasegawa's estimate.

Dr. Hasegawa also opined that, in an eight-hour work day, Plaintiff could "stand and/or walk" for only two hours and sit for three. (R. 8, at PageID.569.) But Plaintiff's six- to eight-hour shifts as a marine deputy required him to remain on his feet. (R. 8, at PageID.69.) And he could pass an eight-hour shift—sometimes longer—with the U.S. Marshals by alternating between sitting and standing. (R. 8, at PageID.71.) As such, Plaintiff's own present work, as evidenced by his testimony, flatly contradicts Dr.

Hasegawa's opinion.

True, the current jobs were part-time and infrequent. But such work can evidence a claimant's ability to engage in substantial gainful activity. 20 CFR § 404.1571 ("The work, without regard to legality, that you have done during any period in which you believe you are disabled may show that you are able to work at the substantial gainful activity level . . . . Even if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did."); *Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1029 (6th Cir. 1990) ("Furthermore, any work done during a period of claimed disability may show that a claimant can engage in substantial activity."). Further, by limiting Plaintiff to light work—which involves lifting less than 20 pounds, 20 C.F.R. § 404.1567(b)—and limiting his exposure to environmental factors, the RFC accounts for the fact that the capabilities Plaintiff demonstrated came during part-time employment.

Plaintiff contends that Dr. Jilani's medical opinion bolsters Dr. Hasegawa's. (R. 12, at PageID.594-595, citing (R. 8, at PageID.270).) But the "opinion" Plaintiff cites was not a statement regarding Plaintiff's functional limitations. Rather, it was a single page containing normal examination results—full strength, independent gait, and regular reflexes—as well as diagnoses of radiating low back pain and a treatment plan. (R. 8, at PageID.270.) The treatment plan, in particular, is conservative, mentioning the possibility of seeing a surgeon in the future but declining even to prescribe pain medication and instead opting for physical therapy, Advil, and a swimming regimen for weight loss. (*Id.*) If anything, then, the cited material supports the ALJ's decision.

41

For these reasons, I suggest that the ALJ gave good reasons for according Dr. Hasegawa's opinion little weight. This decision did not leave the ALJ without substantial evidence for the RFC. In constructing the RFC, the ALJ could use Dr. Hasegawa's opinion as a basis for extrapolation. *McCaig*, 2017 WL 4211047, at *8. More importantly, the ALJ was not forced to cast about in a sea of medical data. The evidence he relied on was accessible to a layperson—physician notes that were not laden in medical argot, Plaintiff's testimony regarding his work experience, and the well-established conservatism of his treatment. Much of this evidence was, in fact, framed in terms of Plaintiff's functional capabilities. The danger of the ALJ mistranslating medical evidence into concrete physical limitations was much reduced.

Thus, I conclude that despite discounting Dr. Hasegawa's medical opinion, the ALJ satisfactorily assembled substantial evidence for the RFC.[18]

### 2.   The VE's Use of the DOT

#### a.   Parties' Arguments

Plaintiff's second argument is that his "past relevant work as a corrections transport officer was incorrectly defined as light work." (R. 12, at PageID.598.) The job involved

---

[18] Plaintiff also contends that the ALJ had predetermined his decision. (R. 12, at PageID.596.) As proof, Plaintiff submits that had the ALJ adopted just Dr. Hasegawa's exertional limitations on standing, walking, and sitting, the Medical-Vocational Guidelines would have mandated a finding of disability under 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 201.4. (R. 12, at PageID.596.) Or had the ALJ credited Dr. Hasegawa's estimation that Plaintiff would miss 10 to 12 days per month and needed multiple unscheduled breaks, he would have been precluded from work according to the VE's testimony. (*Id.*, citing (R. 8, at PageID.80-81).) It is unclear how the ALJ's analysis betrays predetermination other than by rejecting Plaintiff's substantive arguments. But an ALJ's reasoned disagreement on the merits is not evidence of bias—it is the opposite of bias. To the extent Plaintiff attempts to argue that the ALJ based his decision on extraneous prejudicial factors, he has failed to suggest what those factors were.

chaining prisoners and moving them along with their belongings, which were packed in trunks weighing up to 100 pounds. (*Id.*, citing (R. 8, at PageID.66-67).) The VE's testimony that this job related to DOT 372.677-010 and involved light exertion (but was heavy as performed) was erroneous, according to Plaintiff. That DOT code refers to airline security representatives and requires light exertion. (R. 12, at PageID.599.) But the true DOT description of correction officers, DOT 372.667-018, is classified as medium strength work. (*Id.*) Consequently, because the RFC limited Plaintiff to light work, he could not perform the medium-strength labor required by the proper DOT classification of his past work. (R. 12, at PageID.600.)

Defendant responds that the VE's testimony provides substantial evidence for the ALJ's conclusion at step four. (R. 14, at PageID.624-625.) The VE stated that an individual with Plaintiff's RFC could perform the past relevant position as it was generally performed. (*Id.*) All that is required to deny disability at this Step is for a claimant to be capable of performing the past job *either* as it is generally performed or as he actually performed it. (*Id.*, citing 20 C.F.R. § 404.1561(b)(2); SSR 82-61, 1982 WL 31387, at *1 (1982).)

According to Defendant, Plaintiff is mistaken regarding the DOT code. The VE's code, 372.677-101, is for a Patrol Conductor/Correction officer in the fourth edition (1991) of the DOT. (R. 14, at PageID.625.) The exertional requirement for the position is light, which is consistent with the ALJ's RFC. (*Id.*) Defendant surmises that Plaintiff is relying on an earlier edition. (R. 14, at PageID.626.) But it is not clear what source Plaintiff is citing, and so Defendant asks the Court to find the fourth edition, available on the U.S. Department of Labor website and Westlaw, to be more reliable. (*Id.*)

43

### b.      Application

"As a general rule, a claimant is not disabled if she maintains the RFC to perform her past relevant work either as actually performed or as it could generally be performed in the national economy." *Hansen v. Comm'r of Soc. Sec.*, No. 13-13348, 2014 WL 5307133, at *8 (E.D. Mich. Oct. 16, 2014) (citing SSR 82-61, 1982 WL 31387 (1982)). In determining whether a claimant can do past relevant work, the Commissioner can employ various sources of information:

> We may use the services of vocational experts or vocational specialists, or other resources, such as the "Dictionary of Occupational Titles" and its companion volumes and supplements, published by the Department of Labor, to obtain evidence we need to help us determine whether you can do your past relevant work, given your residual functional capacity. A vocational expert or specialist may offer relevant evidence within his or her expertise or knowledge concerning the physical and mental demands of a claimant's past relevant work, either as the claimant actually performed it or as generally performed in the national economy.

20 C.F.R. § 404.1560(b)(2).

The Sixth Circuit has held that "while the ALJ may take judicial notice of the classification in the [DOT], the ALJ may accept testimony of a vocational expert that is different from information in the [DOT]." *Conn v. Sec'y of Health & Human Servs.*, 51 F.3d 607, 610 (6th Cir. 1995). Nonetheless, the Commissioner expects that the VE's testimony will generally align with the DOT. SSR 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000).

When a conflict between VE testimony and the DOT occurs, the ALJ "must elicit a reasonable explanation for the conflict before relying on the VE." *Id.* According to the Sixth Circuit, this obligation is satisfied by asking the VE if the testimony is consistent

44

with the DOT; if the answer is affirmative, the ALJ is not obliged to inquire further. *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 606 (6th Cir. 2009). Past this point, the obligation to suss out inconsistencies falls to Plaintiff's counsel on cross-examination of the VE. *Beinlich v. Comm'r of Soc. Sec.*, 345 F. App'x 163, 168 (6th Cir. 2009). "The fact that [P]laintiff's counsel did not do so is not grounds for relief." *Id.* at 168-169.

If Plaintiff's argument were correct, then the outcome of his disability determination at step four would have been incorrect. The RFC limited Plaintiff to light work, yet according to Plaintiff his past relevant work should be classified as medium work per the correct DOT position.[19]

Even assuming that, pursuant to the law above, such an error would require remand, Plaintiff's argument is unavailing because there was no mistake. Recall that in his past relevant job he transported prisoners. (R. 8, at PageID.67-68.) Plaintiff states that the VE "incorrectly cited the demands of DOT 372.667-010 which is an airline security representative instead of the correction officer position[.]" (R. 12, at PageID.598-599.) He is off by a single digit: the VE testified that Plaintiff's previous work as a correction's officer fell under DOT code 372.*677*-010. (R. 8, at Page ID.74-75.)[20]

Plaintiff's numbering mistake steers his argument off course. Thinking that the VE cited an irrelevant DOT position, Plaintiff pins his case on what he believes is the correct one, DOT code 372.667-018. The VE used that DOT code in her prehearing analysis, (R.

---

[19] The regulations define the categories of light and medium work in 20 C.F.R. § 404.1567 as having "the same meaning as they have in the Dictionary of Occupational Titles."

[20] In the paragraph before his mistake, Plaintiff accurately stated that the VE identified DOT code 372.677-010. (R. 12, at PageID.598.)

8, at PageID.259), but did not mention it at the hearing. The position title for that code gives Plaintiff hope—"Correction Officer," the same title the VE wrote in the pre-hearing analysis and similar to the title she stated at the hearing, "corrections officer transporter position." (R. 8, at PageID. 74-75, 259.) The full DOT description also mentions guarding prisoners in transit, which seems to fit Plaintiff's past job:

> Guards inmates in penal institution in accordance with established policies, regulations, and procedures: Observes conduct and behavior of inmates to prevent disturbances and escapes. Inspects locks, window bars, grills, doors, and gates for tampering. Searches inmates and cells for contraband articles. Guards and directs inmates during work assignments. Patrols assigned areas for evidence of forbidden activities, infraction of rules, and unsatisfactory attitude or adjustment of prisoners. Reports observations to superior. Employs weapons or force to maintain discipline and order among prisoners, if necessary. May escort inmates to and from visiting room, medical office, and religious services. May guard entrance of jail to screen visitors. May prepare written report concerning incidences of inmate disturbances or injuries. May be designated according to institution as Correction Officer, City Or County Jail (government ser.); Correction Officer, Penitentiary (government ser.); Correction Officer, Reformatory (government ser.). May guard prisoners in transit between jail, courtroom, prison, or other point, traveling by automobile or public transportation and be designated Guard, Deputy (government ser.).

DOT Code 372.667-018, 1991 WL 673096 (4th ed. 1991). Its exertional level is medium. *Id.*

But if Plaintiff had looked at DOT code 372.677-010, the one the VE testified about, he would have found it was an even better fit for his past job. The official Dot title is "Patrol Conductor," but the alternative title is "Correction Officer." DOT Code, 1991 WL 673103 (4th ed. 1991). Unlike the DOT position above, which is a general guard position that "[m]ay" involve transporting prisoners, the core function of DOT code 372.677-010 is guarding and securing prisoners in transport:

46

> Guards prisoners being transported in correctional van between jail, courthouse, prison, mental institution, or other destination: Searches or assures that prisoners have been searched by POLICE OFFICER (government ser.) I and receives commitment papers before placing prisoner in van. Watches prisoner to prevent escape or violence. Delivers prisoner to appropriate authority and obtains signed receipt for prisoner. Searches inside of correctional van after each trip to determine if weapons or valuables have been hidden by prisoner. May administer first aid to injured or ill prisoners. May handcuff violent or dangerous prisoners.

DOT Code, 1991 WL 673103. The exertional level is light. *Id.* The position appears an even better description of Plaintiff's work than the DOT code he contends for. Consequently, it seems that he, and not the VE, is mistaken. And even if either DOT code could apply, I can see no error in selecting DOT code 372.677-010.

In sum, the VE correctly cited, and the ALJ's decision properly relied on, (R. 8, at PageID.50), a DOT position for Plaintiff's past work that was generally performed as light work. The VE testified that an individual with Plaintiff's limitations could perform that job. (R. 8, at PageID.75-76.) A claimant who can function in their past employment as that work is generally performed is deemed capable of reentering that prior work. SSR 82-61, 1982 WL 31387 (1982). Therefore, I conclude that the ALJ properly Plaintiff able to perform his past job.

### H.    Conclusion

For these reasons, I conclude that substantial evidence does support the ALJ's decision. Consequently, I recommend **DENYING** Plaintiff's Motion, (Doc. 12), **GRANTING** the Commissioner's Motion, (Doc. 14), and **AFFIRMING** the Commissioner's final decision denying benefits.

## III.  <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  January 11, 2019                    S/ PATRICIA T. MORRIS
                                           Patricia T. Morris
                                           United States Magistrate Judge

## **CERTIFICATION**

    I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: January 11, 2019                     By s/Kristen Castaneda
                                           Case Manager